## Martin Hayward *et al.*, Appellants &c., *versus* Josiah T. Ellis.

A guardian sold his ward's land by auction, being himself the auctioneer, and employ-ed an agent to bid on his account, and there being a question whether the bidding of his agent or a higher bidding by another person was the last before the hammer was down, the guardian decided it in favor of his agent; moreover, according to the conditions of the sale, the purchaser was to take the land at an estimated quanti-ty, unless he elected at the time of the sale to have it measured, but the agent made no such election, yet nevertheless the guardian afterwards had the land measured and the quantity was found to be less than the estimate. The guardian afterwards sold the land at an advance, but in his guardianship account he charged himself with only the auction price as reduced by the measurement; but the judge of pro-bate, at the instance of the ward, decreed that he should account at the advanced *price for which he sold the land*; and upon an appeal to this Court the decree was affirmed; and although it was alleged that the second sale had been rescinded, it was considered that the guardian was not in equity entitled to have another sale in order to ascertain the amount with which he should be charged as the value of the land.

In the case of a purchase of trust property by the trustee himself, if the cestui que trust affirms the sale, the trustee is entitled to an allowance for money paid and services rendered by him in effecting the sale. — Thus under the circumstances above stated, the guardian was allowed the sum paid by him to the agent for his services in purchasing the land.

Where a guardian advances his own money in payment of debts or expenses of his ward, under such circumstances as render that course of proceeding proper, he is entitled to enterest on the money so advanced.

APPEAL from a decree of the judge of probate in the county of Plymouth, upon the presentment of an account by Martin Hayward and Ebenezer Lobdell as guardians of Isaac Churchill, a spendthrift. The appeal was entered by Hayward and Lob-dell as appellants, but both parties filed reasons of appeal.

The guardians considered themselves aggrieved by the decree, because each of them was made to account for the sum of $ 512·50, for cash received of Erastus Leach and Lemuel Sturtevant, for land said to be sold to them on March 27, 1830, and they assigned the following reasons of appeal : —

1. The guardians never sold any land of their ward to Leach and Sturtevant for the sum with which they are made chargea-ble in the account, or for any other sum.

2. If in judgment of law they did unintentionally make sale of the land to Leach and Sturtevant, they are chargeable with a far less sum than they are charged with in the account.

3. In fact the guardians sold the land to Benjamin Warren, on June 22, 1826, and for the sum of $680·11, for which sum only ought they to be made chargeable.

The following reasons of appeal were filed on behalf of Churchill, by Ellis and Cushman, who succeeded Hayward and Lobdell as guardians : —

1. Because in the account is charged the sum of $31·85, '' balance of interest on this account "; and because Hayward has charged the sum of $220·78, balance of private account, and Lobdell, the sum of $446,.amount of private account, in which charges interest is included.

2. Because in the account is charged the sum of $25, paid to Benjamin Warren, which was admitted by Hayward and Lobdell to have been paid to Warren for being the channel of conveyance to themselves, of land of their ward, struck off, at a sale under license of court, for $680·11, which land they resold for $1025, but credited in their account the sum of $680·11 only, on account of the land ; and this sum of $25 was deceitfully and fraudulently paid by the guardians, with the design of benefiting themselves at the expense of the trust estate, and that estate has received no benefit thereby.

At the trial, before *Putnam* J., it appeared that Hayward and Lobdell were appointed guardians in June 1825 ; that at October term 1826 of this Court they obtained license to sell the whole real estate of Churchill, because a partial sale would injure the residue ; and that in pursuance of the license, a sale of the whole real estate was made on June 26, 1826.

In December 1829, the guardians rendered an account in the probate court, in which they charged themselves with the sum of $680·11 received of Warren on account of the homestead farm, part of the ward's real estate sold as above mentioned. It was contended in the court below, on the part of the ward, that the guardians ought to be charged with the sum of $1025 instead of $680·11, on account of the homestead, because it had been purchased, not by Warren, but by the guardians themselves, and had been afterwards resold by them to Leach and Sturtevant for $1025 ; and that all benefit derived from the homestead, during the ownership of the guardians, and from the resale, belonged to the ward ; and the

Hayward
v.
Ellis.

judge of probate decreed that the guardians should be charged with $1025, the amount of the sale to Leach and Sturtevant

Warren testified that he attended the sale, but had no intention of purchasing the homestead. Lobdell took him aside and asked him if he had any objection to buying it for him, and he answered that he had not. Lobdell told him he might bid up to $700, but if it went over that, he did not care any thing about it. It was knocked off to him for $715, and Lobdell ratified the bidding. There was a dispute between the witness and one Simeon Churchill, whose the bidding was, the latter claiming it at $720. The witness, having consulted Lobdell, said he should leave it to the auctioneer. The auctioneer decided in favor of the witness. The witness did not see any unfairness. The witness considered that he took the land by estimate. Three days after the auction he was desired by Lobdell to see Hayward measure it. It was not measured at the witness's request. It came to $680·11 by measurement. The witness received a deed of the land from Hayward and Lobdell in July, and in the following November or December gave back a deed to them. He paid nothing and gave no security. When he gave this deed, he knew that Hayward was to have a part of the estate. Between the time of the auction and the giving of that deed, the ward's father (who had an interest for his life, in the land) died, and the witness could then have sold the land at an advance of $200 or $300. After he had given the deed to Hayward and Lobdell, he called on the wife of the ward, by the request of Lobdell, to see if she would release her dower, but she refused. The witness exacted of the guardians $50 for his trouble and attention, and they gave him $25. If the land had been taken off his hands immediately, he would not have charged any thing. He expected to have no more to do with it.

One Bryant testified, that when the dispute arose at the auction, he said to Hayward, on being applied to by him, that the hammer was down before Simeon Churchill bid.

One King testified, that he thought the fall of the hammer and Simeon Churchill's bidding were very near together, though the hammer fell first. Hayward said he would leave it to the company. A number said it was fair; one Ripley said it was not fair; Hayward probably did not hear him.

Leach testified, that in March 1830 he made a contract with Lobdell for the homestead for $ 1025. Hayward and Lobdell were to give a warranty deed. A deed was executed by them, but their wives had not signed it and it was not satisfactory. Hayward came to the witness a few months after the witness had the deed, and asked for it in order to make some use of it at the probate court, and took it; since which the witness had not seen it. The witness gave his note for one half of the land, and he and Sturtevant had been in possession of it ever since.

Sturtevant testified, that he was present when Hayward called on Leach for the deed, and consented to his taking it. He expected to pay for his part of the land partly in small sums of money from time to time, and partly in labor. He expected to give a note on interest, but never had given one.

Jonathan Parker testified, that the conditions of the sale by auction were, that the purchaser might take by measure or estimate, but that his election was to be made on the spot. Before the sale, the ward's wife and father were willing to release all their rights in the land and have it sold free of incumbrances, if there could be a change of guardians, and the witness, believing it would be of great advantage to the sales, urged Hayward and Lobdell to give up in favor of the selectmen of that year, but they would not. When Lobdell, Hayward and the witness were appointed guardians, they were the selectmen of Plympton.

*Beal* and *Eddy* observed that the only circumstance which had the appearance of moral fraud on the part of the appellants, was the decision in favor of Warren at the auction, but that this was rebutted by the fact, that Hayward was ignorant of the arrangement previously entered into by Warren and Lobdell. As to the conduct and responsibilities of a trustee and the purchase by him of trust property, they cited *Thompson* v. *Brown*, 4 Johns. Ch. R. 619; *Franklin* v. *Osgood*, 14 Johns. R. 527; *Hart* v. *Ten Eyck*, 2 Johns. Ch. R. 76; *Harrington* v. *Brown*, 5 Pick. 521; *Lister* v. *Lister*, 6 Ves. 631; *Davoue* v. *Fanning*, 2 Johns. Ch. R. 252; *Hendricks* v. *Robinson*, ibid. 311; *Palmer* v. *Jones*, 1 Vern. 144.

*W. Baylies* and *W. Thomas*, on the other side, cited *Wallington's estate*, 1 Ashmead, (Penn.) 307; *Lister* v. *Lister*,

Hayward
*v.*
Ellis.

*Oct. 23d.*

Hayward
*v.*
Ellis.

6 Ves. 631 ; *Barrell* v. *Joy*, 16 Mass. R. 226 ; *Randall* v. *Errington*, 10 Ves. 427 ; *Sanderson* v. *Walker*, 13 Ves. 600. As to the interest allowed the guardians, *Storer* v. *Storer*, 9 Mass. R. 37.

*Oct. 26th.*　　PUTNAM J. delivered the opinion of the Court. We have had occasion to consider and declare the law relating to the purchase of estate by executors, administrators, trustees &c., within a few years. In *Jennison* v. *Hapgood*, 7 Pick. 8, determined in 1823, it is declared, that " the law will not permit one to buy an estate, which he was entrusted to sell, in such manner as to make any profit or benefit to himself. It is not strictly true that the trustee may not purchase ; in other words, the purchase is not merely void. If the *cestui que trust* should acquiesce in the sale, he would be bound ; but if he dissents in a reasonable time, the trustee will be considered as holding for the benefit of the *cestui que trust*. A court of chancery would have power to do justice in such a case, either by compelling a reconveyance, or the payment of the excess as ascertained by a second sale." " In *Fox* v. *M'Creth*, the defendant was held to account for the difference between the purchase and resale ; but it was a case strongly marked with gross fraud."

These principles have a direct application to the case before us, and we had hoped that after that decision, executors, administrators, guardians and trustees would not have become purchasers, even with good intentions. We are satisfied that the rule, as one of public policy, is beneficial, and perhaps there are few cases which would lead more strongly to that opinion, than the one now under consideration.

We have seen in the verdict between the same parties, that the jury have found that the appellant Hayward unfaithfully conducted himself in regard to his trust and duty. Now in the case before us, Hayward became the purchaser of the estate of the ward, through an agent. We regret that it does not appear that he adopted that course with a view to the benefit of the *cestui que trust*, as we have no doubt has been frequently done by trustees. If that appeared, this Court would, in the adjustment of the accounts, endeavour to give relief with as little damage to the party who had mistaken his rights, as would be consistent with the just claims of the *cestui que trust*

Now the guardians at this sale should have endeavoured to obtain the best price. It is proved that there was a bidding by some one at the auction, of more money than the agent for the guardian bid. The guardian was the auctioneer. A dispute arose concerning the bidding. There was another offer. It was said that the other bidding was not in season, and the question was left to the auctioneer to determine. If the dispute had been between two strangers who were adversely bidding, and the auctioneer had been disinterested, the reference to him would have been common and fair. If the party claiming the purchase should have waived his right, the sale would have proceeded upon the advanced bidding. Now the reason, why sales by executors, administrators &c., to their agents, are to be maintained, is, that they acted *bonâ fide*, with the intent to obtain the most for those concerned in the estate. It is upon that ground that such sales are not held to be merely void. It frequently has happened, that the bidding by an agent for the account of the executor, administrator, &c. who acts honestly, is greatly advantageous to the *cestui que trust*. But in the case at bar the conduct of the guardian was sinister, adverse and disadvantageous to his ward. He was bound by his duty and oath to obtain the best price ; and at the time of the sale a better price was offered. The guardian, acting fairly, should have waived his right to his bidding, in favor of the party claiming to offer more, so long as any question could be made about it. But he determined in favor of his agent and against his ward. He might not have done so, if he had not been (perhaps unconsciously) influenced by an adverse interest in his own favor. If that bidding had been allowed, other and greater offers might have followed, and the full value of the estate might have been obtained.

Again, the land was put up by estimation or measurement, at the election of the purchaser, *to be made at the time of the sale.* The agent then made no election to have the land measured, and certainly should have been held to pay according to the estimate. But the measure is ascertained after the sale and the price reduced. In this matter, it is not reasonable to suppose, that if the guardian had been acting exclusively for his ward, there would have been such a course pursued in this particular.

There are various other circumstances which the counsel for the appellees have urged, and not without reason, tending to show that the guardians have conducted themselves with sinister motives, upon which we need not remark.

The Court are to determine how this account shall be adjusted. The guardians are content to credit the amount which the agent bid at the auction. The appellees claim the amount for which the guardians resold the estate ; and the judge has allowed it.

Upon the facts proved we are of opinion that there was a resale. There has been no acquiescence on the part of the *cestui que trust.* It is denied that the sale to Leach and Sturtevant was completed. It is true the deed from the guardians to them is not on record, and was in their power after it was given ; but it is replied, that it was obtained from the grantees for a particular purpose only, viz. to be used at the probate court ; and it is proved that the grantees remain to this day in the possession of the estate. We think it should be treated as a resale of the property by the guardians. And we do not think there are any equitable considerations which should induce the Court to have the estate sold again, if the guardians have in fact rescinded the sale to Leach and Sturtevant. The rule laid down in *Jennison* v. *Hapgood* is, that the trustee shall not buy in such manner as to make any profit to himself. It may be that the estate has fallen in value ; but we are, under all the circumstances, satisfied, that the guardians are bound to account for the amount for which they sold the estate to Leach and Sturtevant.

This is the main question. There are others which the Court have considered, and will decide without sending the case to auditors.

It is contended for the appellees, that large sums of interest have been allowed by the judge to the guardians. We think the allowance was properly made. It is not like the administration of the estate of an intestate. But the guardians were to make disbursements. They might have hired the money, and if they advanced it properly, we think they should have the interest.

It is also said the judge of probate has erred in allowing to the guardians 25 dollars which they paid to Warren for his agency. Now we think that was right, and upon this principle. The *cestui que trust* affirms the doings of the guardians. He calls for an account of what they have received. Of course he is to make the allowances for money paid and services rendered by which the sale was effected. *Quoad hoc*, the guardians are to be considered as the authorized agents of the *cestui que trust*.

And the same remark applies to the allowance for compensation for personal services. It cannot be said by the appellees that they were of no benefit. The guardians have effected a sale of the estate for as much as it is worth, we may presume, or the appellees would consent to take it back. The guardians should be paid ; and the allowance made by the judge is not deemed by the counsel for the appellees to be too great, if any allowance should be made for their services.

And without more particularly stating the items and reasons, we are all of opinion that the decree of the judge of probate should be confirmed, and that the papers be remitted to the probate court for further proceedings conformably to this decree.